**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-4218

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STEPHEN L. SNYDER,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore. Deborah L. Boardman, District Judge.  (1:20-cr-00337-DLB-1)

Argued:  May 7, 2026                                   Decided:  July 14, 2026

Before WILKINSON and WYNN, Circuit Judges, and KEENAN, Senior Circuit Judge.

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge Wilkinson and Senior Judge Keenan joined.

**ARGUED:**  C. Justin Brown, BROWN LAW, Baltimore, Maryland, for Appellant.  Mary Jessica Kirsch Munoz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Lylian Romero, BROWN LAW, Baltimore, Maryland, for Appellant.  Kelly O. Hayes, United States Attorney, Greenbelt, Maryland, David C. Bornstein, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

WYNN, Circuit Judge:

A defendant who is competent to stand trial is competent to waive the right to counsel.

Stephen Snyder was charged with attempted extortion of a hospital and insisted on representing himself at trial. His performance was so poor and his relationship with the judge so contentious that he served a night in jail for contempt of court during the trial. The jury found him guilty. Snyder now asks this Court to overturn his conviction because his cognitive decline affected his performance as his own attorney.

But his concession that he was competent to stand trial precludes this argument, and his other arguments on appeal also lack merit. Accordingly, we affirm.

I.

A.

For nearly fifty years, Snyder was a prominent Maryland attorney, primarily representing plaintiffs in medical malpractice suits. But toward the end of his career, he developed a scheme in which he threatened to run a targeted advertising campaign against the transplant center of the University of Maryland Medical System ("the Hospital") unless it agreed to pay him, personally, $25 million. The details of that scheme follow.

In 2017 and 2018, Snyder represented patients who had received allegedly substandard care when receiving transplants at the Hospital. At the settlement conference for one of those cases in January 2018, Snyder met with the Hospital officials, including attorneys Natalie Magdeburger and Sue Kinter and Dr. Stephen Bartlett, then the Hospital's chief medical officer. Snyder took Barlett aside and privately told him that he had other

2

clients with medical malpractice claims. He asked for Bartlett's personal cell phone number, which Bartlett gave him.

Snyder and Bartlett exchanged text messages and ultimately agreed to meet for dinner in March 2018, to be joined by Snyder's girlfriend and Bartlett's wife. At the dinner, Snyder asked to speak privately with Bartlett at the bar. He had the maître d' deliver a folder that contained gruesome post-operative photos of one of his clients, Jeffrey Sanders. Snyder told Bartlett that he would use the Sanders case to take down the Hospital by making a video about the Hospital's transplant program "and he was prepared to show it and put it on TV and do newspaper ads if [Bartlett] did not cooperate with him." J.A. 1106.[1] By "cooperate," Snyder made clear, he meant that the Hospital should personally pay him $25 million by employing him "in some capacity, perhaps as a consult." *Id.*

When Bartlett and Snyder rejoined their companions at the dinner table, Snyder continued to press the issue. He "repeated over and over and over again," while looking at Bartlett's wife, that "as long as [Bartlett] does what I want him to do, you'll be okay." J.A. 1107. Bartlett's wife left the dinner feeling "scared and threatened." J.A. 1180.

In the weeks after the dinner, Snyder continued to text Bartlett about the Sanders case. Snyder texted Bartlett to ask whether he had "talked to" the Hospital's attorney, Kinter. J.A. 1108. He later texted, "If I don't get a straight answer, I'm going to go forward full blast." *Id.* He then wrote, "The debacle at your hospital at your helm must be taken extremely seriously. Otherwise, I cannot help you." *Id.* Finally, Bartlett responded,

---

[1] Citations to the "J.A." and "S.J.A." refer, respectively, to the Joint Appendix and Sealed Joint Appendix filed by the parties in this appeal.

"[Kinter] and I just spoke. I explained to her that we're in jeopardy for fraud and punitive damages. She understands the ball is in your court." J.A. 1109.

At some point after his transplant, Jeffrey Sanders passed away. Snyder represented his wife, Michele Sanders ("Sanders"), as the representative for Jeffrey's estate and met with the Hospital on three separate occasions.

In April 2018, Snyder and his associate Kevin Stern met with Kinter, Magdeburger, and Dr. DePriest Whye, who represented the hospital. There, Snyder threatened the Hospital again: with a press conference, a front-page story in *The Baltimore Sun*, a television commercial, and a targeted digital campaign that would direct anyone searching for the Hospital's transplant services online to an advertisement for Snyder's law firm. However, as relayed in his prepared remarks for the meeting, he also told the Hospital that it could "silence" Sanders and "bury what [his] investigation has uncovered" if the Hospital would "pay a $25 million premium." J.A. 1766.

In June 2018, Snyder and Stern met again with Kinter, Magdeburger, and another Hospital attorney, Alicia Reynolds. Unlike in the first meeting, this time Snyder "changed course" by separating the settlement of the Sanders case, which he thought could settle for up to $5 million, from the $25 million he wanted the Hospital to pay him personally. J.A. 1490. However, he told the Hospital that it "had to do both and if [it] didn't do both, he would go on this media campaign and destroy the hospital and destroy the transplant program and destroy Dr. Bartlett's . . . career." *Id.* He also told Kinter that if the Hospital did not agree to the deal, it "would blow up in [her] face," and that "the University would fire [her]." *Id.* To accentuate his point, he played a video he had created that compared the

4

fallout the Hospital would experience to a similar downfall by the transplant program at Baylor University in Texas.

To avoid those outcomes, he proposed that the Hospital hire him as a consultant for $25 million to conflict him out of any further cases he might otherwise bring against it. As to what the proposed consultancy would look like, Snyder seemed unconcerned with the details. At one point, he suggested the payment could be broken up over ten years, if necessary. And as for what he would do in return, he suggested "he could be a janitor, [he and the Hospital] could have lunch once a month, catch up, or [the Hospital] didn't have to see him for ten years." J.A. 1510.

Kinter left the June 2018 meeting "absolutely stunned." J.A. 1493. Feeling that she was being extorted, she contacted both a criminal-law attorney and law enforcement to seek advice on how to respond. From that point on, she worked with the FBI to record conversations she had with Snyder.

One such conversation took place in August 2018, when Snyder and Stern met with Kinter, Magdeburger, Reynolds, and Whye at the Hospital. Snyder again repeated his demand to settle the Sanders case and, separately, to collect $25 million as a consultant to the Hospital. He also mentioned to the Hospital that he had retained an ethics attorney, Andrew Graham, to make sure the consultant agreement was ethical. He requested that Magdeburger meet with Graham "to figure it out ethically, morally, comfortably, to see if there's a solution how to do it." J.A. 223.

In September 2018, the Hospital settled the Sanders case for $5 million. However, in recorded phone calls with Kinter, Snyder continued to push for the separate $25 million

5

consultancy. At Snyder's urging, Magdeburger eventually agreed to speak with Graham by phone. During that phone call, Magdeburger asked Graham what he knew about the consultancy arrangement Snyder was proposing, to which Graham replied, "Well, I don't know much." J.A. 299. All he knew was that Snyder and the Hospital had "been talking about entering into a kind of consulting agreement or retainer agreement . . . that would provide them with his advice and perspectives [on] medical malpractice cases," which "would prevent him from . . . pursuing any claims against the hospital." *Id.* However, he had "no specifics" about how the agreement came about or the discussions Snyder had had with the Hospital up to that point. J.A. 300.

The Hospital never agreed to the $25 million consultancy arrangement.

B.

In October 2020, a grand jury indicted Snyder on charges of attempted extortion under the Hobbs Act and violations of the Travel Act. *See* 18 U.S.C. §§ 1951(b), 1952(a)(3), 1952(b)(2).

Snyder retained counsel, but his attorney later withdrew from representation over his objection. Snyder then informed the court that he wanted to represent himself, so a magistrate judge conducted a hearing on December 8, 2023, pursuant to *Faretta v. California*, 422 U.S. 806 (1975).

The magistrate judge gave Snyder frank advice that he believed it was not prudent to proceed pro se: "I think the decision to represent yourself is probably not a very good one," and "the man who represents himself has a fool for a client." J.A. 519. But when pressed if he had any hesitation about representing himself, Snyder stood firm: "I do not

6

have any doubt." J.A. 522. So, after engaging in an extended colloquy with Snyder about his right to counsel and the burdens of proceeding pro se in an extended federal trial, the magistrate judge found that Snyder was voluntarily, knowingly, and intelligently waiving his right to counsel.

The magistrate judge appointed Gerald Ruter as standby counsel. Two paralegals also assisted Ruter and Snyder during the trial.

So the case proceeded through pretrial motions. During a July 26, 2024, hearing, Snyder's declining health became apparent. Snyder informed the court that he was under 24-hour medical care; that he was being treated by a urologist, two neurologists, and a cardiac specialist; that he had problems with his gait; and that he was "scared about falling." S.J.A. 3062. He also informed the court that he had recently failed a short-term memory test. At one point during a break, Snyder fell in the bathroom, injured his head and arm, and stayed on the bathroom floor for over half an hour until Ruter discovered him there.

Still, when pressed on whether these health issues caused him to have any questions about his competency or ability to represent himself, Snyder replied, "No, I think I'm fine." S.J.A. 3063. The district court tried again, asking whether Snyder would consider letting the court appoint Ruter to represent him. Snyder again declined: "No, I want to be the counsel. If I feel that I can't do it, I'll certainly bring it to [your] attention. . . . [P]lease, don't unilaterally say I need counsel." S.J.A. 3106–07.

During an evidentiary hearing on October 28, 2024, the court ruled that Snyder could not bring up at trial any personal attacks against the former prosecutor assigned to the case.

7

At that same hearing, Snyder's health concerns came up again. He informed the court that his doctors were "investigating whether I have Parkinson's disease." S.J.A. 3140. The court granted him an accommodation to sit rather than stand at trial as he deemed appropriate. At the end of the hearing, the district court pressed Snyder yet again on whether it was wise to continue to represent himself: "I have told you my opinion that it's probably not the wisest decision, not because it's you, but because representing yourself in a criminal trial is incredibly, incredibly challenging and could be prejudicial to your case before the jury." S.J.A. 3197. The district court judge then ordered Snyder to meet with a magistrate judge two days later to discuss the matter further.

On October 30, a magistrate judge conducted another *Faretta* hearing with Snyder and his standby counsel Ruter, outside the presence of the government, "to discuss your intention to continue to represent yourself now during the trial. It's one thing to represent yourself during pretrial motions; it's a different thing to represent yourself during the trial." S.J.A. 3222.

More to the point, the magistrate judge asked, "Would you, Mr. Snyder, hire a lawyer who . . . has two neurologists," "loses his train of thought," said "I'm not able to practice law again, I don't have the confidence," said "I'm going to have difficulty doing this trial," "failed a memory test," and "has short-term memory loss?" S.J.A. 3228–29.

But Snyder refused to change his mind. He noted that he had already prepared an opening statement and prepared cross-examination for every witness. "I'm prepared. And that's the reason for my success. Nobody works harder than me." S.J.A. 3237.

8

So the magistrate judge, after noting for the record that he had "made my best case as a magistrate judge, . . . and a former defense attorney [for] why that's not a good idea," found that Snyder was "committed" to his decision to self-represent and allowed the case to continue to trial with Snyder in the driver's seat. S.J.A. 3247.

C.

The parties proceeded to trial in November 2024. Over the course of a nine-day trial, the government called eleven witnesses, after which Snyder called six witnesses of his own. The jury returned a conviction on all eight counts. A few occurrences during trial are relevant on appeal.

First, the district court agreed to limit Sanders's testimony so that she would not violate the terms of the nondisclosure agreement she had signed to settle her husband's medical malpractice suit.

Second, toward the end of trial, Snyder requested a reliance-on-counsel jury instruction in support of his theory that his behavior had not been extortionate because he had involved an ethics attorney, Graham. The district court refused to give the requested jury instruction because it found that Snyder had not shown through the evidence that he had fully disclosed his plans to Graham.

Finally, Snyder generally struggled to put his best foot forward when representing himself at trial.

Throughout Snyder's direct and cross-examinations, he repeatedly veered off into irrelevant lines of inquiry, attempted to introduce his own version of the facts through questioning, and flagrantly violated the court's pretrial orders. For example, on several

9

occasions, Snyder directly violated the court's pretrial ruling that he should not mention a particular former prosecutor. He also littered the record with snide and inappropriate comments. To take just one instance, during Kinter's testimony, Snyder openly mocked her in a manner the court described as "completely out of line, rude, and shocking." J.A. 1602.

As a result, the district court grew increasingly frustrated with Snyder. The judge repeatedly noted for the record that Snyder was frequently "yelling at" her in a "heated" and "threatening" tone. J.A. 1649, 1930. And she emphasized that "the cold record doesn't reflect the anger with which he's asking questions much of the time, the hostility towards the Court, the fighting with me, [and] the fighting with the witness." J.A. 1946.

Ultimately, the only tactic that seemed to have any success at controlling Snyder was giving time limits on his examinations and closing statement. Still, following the close of evidence but before the jury had reached a verdict, the court sua sponte conducted a contempt hearing, noting Snyder's repeated violations of its orders and remanding him to the custody of the U.S. Marshals overnight.

The next day, Snyder informed the court that he was worried the jurors may have seen news about his confinement for contempt on television the night before. He requested that the district court voir dire the jury to determine whether any of them had "seen any newscasts about this case over the last three days." J.A. 2529. The court declined to do so, noting it had already admonished the jury not to read any news about the case and pointing out that asking the question would simply "draw more attention to it and perhaps pique people's curiosity more than necessary." J.A. 2532.

10

The jury found Snyder guilty on all counts, and Snyder timely appealed his convictions, this time with the aid of counsel.

## II.

Snyder argues that the district court erred in four ways: (1) in denying him a right to due process and counsel by allowing him to proceed pro se, (2) in refusing to give the reliance-on-counsel instruction, (3) in limiting Sanders's testimony in line with the nondisclosure agreement, and (4) in refusing to voir dire the jury about news of his contempt arrest. We disagree and affirm.

## A.

Snyder first argues that the district court "erred in allowing [him] to proceed *pro se*, or alternatively, in failing to revoke his *pro se* status despite having knowledge of his cognitive impairment, short-term memory loss, and potential Parkinson's diagnosis." Opening Br. at 15–16.

"Whether a defendant waived his right to counsel is a legal question we review de novo." *United States v. Ziegler*, 1 F.4th 219, 227 (4th Cir. 2021). However, we review a court's "factual competency findings only for clear error." *Id.* When, as here, a defendant asks us to review whether a court should have "sua sponte reconsider[ed] its decision that [he] was competent to stand trial and waive counsel," we review for plain error. *United States v. Bernard*, 708 F.3d 583, 592 (4th Cir. 2013).

Under the Sixth Amendment to the Constitution, a criminal defendant enjoys not only a right to representation, but also a right to self-representation. *Faretta v. California*, 422 U.S. 806, 832 (1975). "Such a person may waive the right to counsel and proceed at

11

trial pro se only if the waiver is (1) clear and unequivocal, (2) knowing, intelligent, and voluntary, and (3) timely." *Bernard*, 708 F.3d at 588. "To waive counsel, a defendant must also be mentally competent." *Ziegler*, 1 F.4th at 226.

At oral argument before this Court, Snyder's appellate counsel began by conceding that he was competent to stand trial at every stage of the proceedings against him. *See* Oral Argument at 0:45–0:52, https://www.ca4.uscourts.gov/OAarchive/mp3/25-4218-20260507.mp3. That concession is fatal to his appeal of this issue.

As we have already held, a defendant who is competent to stand trial is necessarily competent to waive his right to counsel. *United States v. Frazier-El*, 204 F.3d 553, 559 (4th Cir. 2000). That is, "a defendant is competent to waive his right to counsel when he (1) has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and (2) he has a rational as well as factual understanding of the proceedings against him." *Ziegler*, 1 F.4th at 227 (quotation omitted).

Here, the magistrate judge conducted two separate *Faretta* hearings: one in December 2023, and another just before trial in October 2024. In the first *Faretta* hearing, Snyder made clear he understood the charges against him and the possible penalties, agreed that he was "up to speed with current Supreme Court and Fourth Circuit criminal procedures" and "substantive criminal law issues," and understood the "disadvantages of representing" himself. J.A. 508–09. At the second hearing, he confirmed that he understood what his role would be at trial, as well as the role of standby counsel. And he rebuffed several efforts by the magistrate judge to convince him not to move forward with self-representation.

12

Accordingly, we discern no clear error in the magistrate judge's finding that Snyder was competent to represent himself at trial.

Rather than meaningfully contest the sufficiency of the *Faretta* hearings, Snyder instead argues that the district court should have sua sponte appointed him counsel against his will. In support, he points us to language from the Supreme Court's decision in *Indiana v. Edwards* that a court may limit a "defendant's self-representation right by insisting upon representation by counsel at trial [if] the defendant lacks the mental capacity to conduct his trial defense unless represented." *Indiana v. Edwards*, 554 U.S. 164, 174 (2008).

But Snyder fundamentally misunderstands the Supreme Court's holding in *Edwards*: *Edwards* tells us what a court *may* do, not what it *must* do.

In *Edwards*, a pro se defendant suffering from schizophrenia was declared competent to stand trial after three different psychiatric evaluations. *Id.* at 169. An Indiana state court nevertheless found that while the defendant was competent enough to stand trial, his schizophrenia rendered him incompetent to represent himself at trial. *Id.* The Indiana Supreme Court reversed, holding that the lower court had violated the defendant's Sixth Amendment right to self-representation under *Faretta*. *Id.* But the Supreme Court disagreed, holding that state courts may, in their discretion, deny defendants the right to represent themselves at trial if "the defendant lacks the mental capacity to conduct his trial defense unless represented." *Id.* at 174.

As we have explicitly held, however, "while a court *may* impose a 'higher standard' on a defendant before permitting him to waive counsel and proceed pro se, nothing *requires*

13

a court to do so." *Ziegler*, 1 F.4th at 227 (second emphasis added) (quoting *Bernard*, 708 F.3d at 585).[2]

That is for good reason, as there are practical concerns with the rule Snyder seems to be inviting us to adopt: that a court *must* revoke a defendant's self-representation rights if the court finds the defendant competent to stand trial and yet is on notice that the defendant will not be able to competently proceed pro se at trial.

First, as applied here, there is little separating Snyder from the scores of other pro se defendants who choose to represent themselves at trial every year.

It is true that Snyder's performance at trial fell far short of what we would expect from a competent member of the criminal defense bar. But that is true of virtually every defendant who proceeds pro se. Indeed, most pro se defendants likely perform even worse than Snyder, who at least was a trained attorney with decades of experience and had some understanding of judicial norms and the rules of evidence. And yet, we have consistently held that courts were justified in allowing even the most poor-performing pro se defendants to rely on their own second-rate advocacy, should they make that choice. *E.g.*, *Ziegler*, 1 F.4th at 225 (affirming the defendant's right to represent himself at trial even though he "asked several strange questions, was argumentative with the witnesses, . . . and argued with the judge"); *Bernard*, 708 F.3d at 587 (affirming self-representation at trial even

---

[2] Indeed, as far as we can tell, none of our peer circuits has ever held that a district court abused its discretion in failing to revoke such rights, under any circumstance. *See United States v. Garrett*, 42 F.4th 114, 119 (2d Cir. 2022) (collecting cases).

though the defendant "made no objections during the Government's case-in-chief, and failed to question two of the witnesses or call witnesses on his own behalf").

Second, Snyder's proposed rule would put district courts in an unenviable bind. *Faretta* cautions courts not to revoke a defendant's self-representation rights unless the defendant has "engage[d] in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n.46. But were we to set up an opposite guardrail—allowing a defendant to challenge his conviction for a court's *failure* to revoke his *Faretta* rights—we risk opening the floodgates to pro se defendants seeking a second bite at the apple once they inevitably fail to perform as a trained attorney might at trial.

Defendants can, of course, challenge their competency to stand trial on appeal. But we decline to force upon district courts the unpalatable task of constantly inquiring as to whether a particular pro se defendant is performing well enough as his own attorney to justify continued self-representation. Indeed, the Supreme Court anticipated that very problem in *Faretta*: "Thus, whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" *Id.*

*Could* the district court have revoked Snyder's self-representation rights in this case? Perhaps. But was it *required* to? No.

No matter how poor Snyder's performance at trial, the only legal basis for requiring a district court to revoke his self-representation right is an inability to consult with a lawyer or a lack of rational understanding of the case against him. Neither applies, so we affirm

15

the decisions by the magistrate judge and the district court to allow Snyder to represent himself at trial.

B.

Snyder next argues that the district court erred in failing to give his proposed reliance-on-counsel instruction to the jury.[3]

"We review the decision to give or not give a jury instruction, and the content of an instruction, for abuse of discretion." *Burgess v. Goldstein*, 997 F.3d 541, 557 (4th Cir. 2021). "A district court commits reversible error in refusing to provide a proffered jury instruction only when the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Lighty*, 616 F.3d 321, 366 (4th Cir. 2010) (quotation omitted). Thus, "upon proper request, a defendant is entitled to an instruction submitting to the jury any theory of defense for which there is a foundation in the evidence." *United States v. Hicks*, 748 F.2d 854, 857 (4th Cir. 1984).

To demonstrate such a foundation for a reliance-on-counsel instruction, however, a defendant must "establish (a) full disclosure of all pertinent facts to an attorney, and (b) good faith reliance on the attorney's advice." *United States v. Westbrooks*, 780 F.3d 593, 596 (4th Cir. 2015) (quotation omitted). If a defendant cannot point to evidence of both presented at trial, the instruction is inappropriate. *United States v. Shareef*, 852 F.

---

[3] For the full instruction, see 1 Modern Federal Jury Instructions—Criminal ¶ 8.04 (2026), *quoted in* Opening Br. at 29–30.

App'x 92, 95 (4th Cir. 2021) (per curiam). "In general, we defer to a district court's decision to withhold a defense in a proposed jury instruction in light of that court's superior position to evaluate evidence and formulate the jury instruction." *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012) (cleaned up).

We agree with the district court that Snyder failed to lay a sufficient evidentiary foundation to establish that he had fully disclosed all pertinent facts to his ethics attorney, Graham.

First, there is inadequate trial evidence that Graham knew the full scope of what the supposed consultancy arrangement would entail. Graham began his conversation with Magdeburger by stating, "I don't know much" about the consultancy. J.A. 299. He didn't know who had proposed the agreement or "how much work [Snyder would] have to do" as part of the agreement. J.A. 302. He had "no specifics" about how it came about and was not sure if Snyder had "still got an ongoing case" or if the agreement was "tied to a specific" case at all. J.A. 300, 303.

Second, even if he fully understood what the consultancy agreement entailed, there is certainly no evidence that Graham understood the heart of the extortion allegations: that Snyder was threatening to shut down the Hospital, get Kinter personally fired, ruin Dr. Bartlett's career, and run an aggressive media campaign against the Hospital if it did not agree to personally pay him $25 million. Indeed, at trial, Graham testified explicitly that he did not, at any point, "advise Mr. Snyder that he could seek a consultancy with [the Hospital] by threatening to destroy the transplant department." J.A. 1433.

17

Given that lack of evidentiary foundation, this case parallels the facts in *United States v. Schmidt*, 935 F.2d 1440 (4th Cir. 1991). In *Schmidt*, we upheld a district court's decision not to give a reliance-on-counsel instruction "in the face of inadequate evidentiary support" because the defendant allegedly relied on advice from his accountant "only as to the legality of certain deductions, not upon the essential questions of what income could be assigned to [an unincorporated business organization] or whether a trustee could maintain control and dominion over assets held in trust and not invalidate the trust for tax purposes." *Id.* at 1449.

Keeping in mind the wide discretion we give the trial court in fashioning jury instructions, we are satisfied that the district court did not abuse its discretion in declining to instruct the jury as to the reliance-on-counsel defense.

Accordingly, we affirm.

## C.

Snyder next argues that the district court erred when it limited Sanders's testimony at trial.

We review rulings "on the admissibility of evidence" and rulings "in the realm of trial management" for abuse of discretion, recognizing that "district courts are charged with the duty of maintaining 'reasonable control over the mode and order of examining witnesses and presenting evidence' in order to promote the truth-seeking function of the trial, to avoid wasting time, and to protect witnesses from harassment." *United States v. Woods*, 710 F.3d 195, 200 (4th Cir. 2013) (quoting Fed. R. Evid. 611(a)).

18

At trial, Sanders arrived with her own personal attorney, who informed the court that he had concerns that her testimony might run afoul of a non-disclosure agreement she had signed with the Hospital to settle her husband's medical-malpractice claim. That agreement generally barred Sanders from discussing the details of her husband's case but contained an exception for court orders that required disclosure.

To accommodate that request, the district court struck a balance. It allowed Sanders to discuss the ultimate amount of the settlement, as well as Sanders's own role in suggesting to Snyder the idea of a consultancy as a condition of the settlement. However, it would not order her to reveal any details about her husband's underlying claim.

As a result, any time Snyder asked Sanders about the circumstances that led to the death of her husband, she would respond, "I am not permitted to answer that question." *E.g.*, J.A. 2145. To address the obvious oddity of those non-responses, the court itself intervened and informed the jury, "I think it's important for you to know that Ms. Sanders signed a nondisclosure agreement as part of her settlement. These are routine. Ms. Sanders was trying not to violate the terms of that agreement." J.A. 2151.

The question is whether that intervention violated Snyder's constitutional right to a fair trial.

The Fifth Amendment guarantees criminal defendants "due process of law." U.S. Const. amend. V. The Compulsory Process Clause of the Sixth Amendment further guarantees a criminal defendant the right of "compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI. The Supreme Court has made clear that bound up in these amendments is a right in a criminal trial "to confront and cross-examine witnesses

19

and to call witnesses in one's own behalf." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). Further, a court "may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony." *Rock v. Arkansas*, 483 U.S. 44, 55 (1987).

Still, "the right to present relevant testimony is not without limitation." *Id.* Such a right "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 295. And a constitutional violation occurs "only when loss of the evidence prejudiced the defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 868 (1982). In this context, a defendant must demonstrate prejudice with "some plausible showing of how [the witness's] testimony would have been both material and favorable to his defense." *Id.* at 867.

Here, without wading into the thicket of whether a criminal defendant's constitutional rights are violated by a witness's refusal to answer based on a non-disclosure agreement, we affirm the district court's handling of the agreement on the grounds that Snyder was not prejudiced by the partial exclusion of Sanders's testimony.

Snyder argues on appeal that Sanders's testimony served three principal purposes: (1) "she could have supported Snyder's contention that [the Hospital] had engaged in widespread misconduct in its kidney transplant program," (2) she "could have explained why she gave Snyder a mandate to take on a consultancy," and (3) she "could have established that Snyder's efforts at obtaining a consultancy were not wrongful—for the reason that Snyder legitimately believed there existed systemic problems within [the Hospital's] transplant program." Opening Br. at 41.

20

As to Snyder's first purpose, testimony about the Hospital's alleged widespread misconduct in the transplant program was thoroughly covered by other witnesses at trial, primarily through Snyder's own witnesses. Because Sanders's testimony on this point would have been "merely cumulative to the testimony of available witnesses," *Valenzuela-Bernal*, 458 U.S. at 873, Snyder cannot establish prejudice as to his first purpose.

As to Snyder's second purpose, the record is clear that the court explicitly allowed Sanders to testify about her role in suggesting the consultancy and her motivations for doing so. At trial, Sanders testified that she did not "have any interest in receiving economic money for the death of [her] husband." J.A. 2145. She also testified that she "asked [Snyder] to become a consultant to" the Hospital as part of his representation of her, J.A. 2152, and had even written down the consultancy as a demand in an early mediation session with the hospital. She did so, she testified, because she wanted to make sure "this would never, ever, ever happen to anyone again." J.A. 2159. She also told Snyder that if he "ever [saw] the doctors that were let loose at the hospital, you could let me know when you were there at the transplant department." *Id.*

Finally, as to Snyder's third purpose, testimony about whether Snyder legitimately believed there existed systemic problems within the Hospital's transplant program was both irrelevant to the elements of extortion and already covered by other witnesses.

It was irrelevant because Snyder's belief that the transplant program engaged in misconduct has no bearing on whether his conduct constituted extortion. As the court instructed the jury, extortion has three elements: (1) "the defendant attempted to wrongfully obtain the property of another," (2) "the defendant attempted to obtain this property with

21

the victim's consent through the wrongful use or threat of force, violence, or fear," and (3) "as a result of the defendant's actions, interstate commerce or an item moving in interstate commerce would have been delayed, obstructed, or affected in any way or degree." J.A. 2417; *see also United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023) ("[W]hen a party threatens harm to demand property to which he has no claim of right, the threat is extortionate."). Even if Snyder believed the Hospital was rife with misconduct, that fact does not help the jury resolve any of those three elements.

And, regardless, such testimony would have been cumulative. Dr. Bartlett's testimony made clear that Snyder believed that the Hospital's transplant program was a "debacle" that would be a "gold mine" for a plaintiff's attorney. J.A. 1108–09. Attorney Reynolds testified that Snyder thought the Hospital's transplant malpractice issues rivaled that of Baylor University's transplant program, which had almost gone out of business for similar malpractice concerns. And indeed, Dr. Whye testified that Snyder believed that the Hospital's malpractice problems were "Baylor on steroids." J.A. 973.

Overall, then, Snyder failed to demonstrate that he was materially prejudiced by the court's partial exclusion of Sanders's testimony. Finding no abuse of discretion, we affirm the court's evidentiary ruling.

D.

Finally, Snyder argues the district court erred in refusing to voir dire the jury to determine whether any juror had seen news reports of his contempt arrest during trial.

We review the decision not to voir dire a jury about allegedly prejudicial news stories for abuse of discretion. *Jones v. Wellham*, 104 F.3d 620, 629 (4th Cir. 1997).

22

Once a party brings prejudicial publicity to the district court's attention, a district court must determine whether, under the totality of circumstances, there is a "substantial reason to fear prejudice." *Id.* (quotation omitted). If not, there is no need to "raise the question with the jurors." *Id.* "[W]hether there is such a substantial reason, hence a necessity to make inquiry, is committed in the first instance to the district court's informed discretion." *Id.* (quotation omitted).

In *Jones*, a plaintiff brought to the court's attention that two newspaper articles were published about her trial on the final day of trial, after all testimony was completed: one which mentioned an incident that the court had excluded from evidence, and another that stated that one of her witnesses had failed a lie-detector test concerning his testimony. *Id.* at 628. The district court determined that the combined risk that any juror had actually read the articles and that reading them would prejudice the plaintiff's case "was not substantial enough to compel raising the question with all jurors." *Id.* at 629.

We upheld that determination under an abuse-of-discretion standard of review. In doing so, we noted that the questioning itself might implicate a "countervailing risk" of revealing "the existence of possibly prejudicial publicity about which no juror may have been aware," or ascribing to that publicity "a greater significance than its contents actually warranted." *Id.*

So, too, here. As in *Jones*, the court had already repeatedly warned the jury not to look up "anything connected to this case" and that "[i]f you see or hear anything that you should not or you see or hear that someone else is saying or doing something that breaks these rules, please notify the courtroom deputy immediately." J.A. 843. Additionally, the

23

court rightly observed that asking the question at all risked drawing unwarranted attention to it.

On appeal, Snyder points to no evidence in the record to rebut "the presumption that jurors would properly observe the court's admonitions to avoid or disregard media publicity about the case." *Jones*, 104 F.3d at 629; *see also United States v. Grande*, 620 F.2d 1026, 1031 (4th Cir. 1980) (finding no abuse of discretion in decision not to voir dire jury under similar circumstances when the judge had "instruct[ed] the jury again not to read 'anything that touches on something that goes on in this case,' and . . . repeatedly told them to come to him and tell him if they had read or been influenced by any outside publicity").

Accordingly, we find no abuse of discretion in the district court's refusal to voir dire the jury.

### III.

For the foregoing reasons, we affirm the judgment of the district court in full.

*AFFIRMED*

24